The next case is United States v. Carlton Williams. Ms. Bronson. Thank you, Your Honor. May it please the Court, my name is Kimberly Bronson, I'm an assistant federal public defender, and I represent the appellant, Mr. Williams, in this matter. With the Court's permission, I would like to reserve three minutes for rebuttal. Granted. Thank you. Your Honor, the primary question in this case is what conduct is required of a citizen in order to revoke previously given consent to search. And in this case, I submit that the evidence of record, and in particular, the audio and video record evidence, demonstrates that Mr. Williams did everything in his power to revoke his consent the night he was pulled over. And to the extent that that... Isn't that a little bit of an exaggeration? I mean, if you were advising him, if he had called you on the phone, this is a lengthy traffic stop in the winter. Correct, Your Honor. If he had called you on the phone, said, you know, this is ridiculous, I've been out here in the cold for 40 minutes. I think your advice would be, you tell those officers, I no longer consent, and you cannot search my car any longer. In a perfect world, I would agree with that. Right. So when you said he did all he could... Under the circumstances of this case. Well, he could have said that. I mean, that would have taken some degree of legal knowledge or perhaps extensive engagement with the criminal justice system to know that. But those words, you know, stop. You can't search my car anymore. I no longer consent. There were five or ten different ways to say that. He didn't say those things. Well, he did testify, Your Honor, that he told Officer Volk, you've searched my car three times now. And if I may have the court's indulgence, you've searched my car three times. I need to go now. Basically, I've had enough. The district court found that credible only to a degree. And I think that's very important because the district court's reasoning in finding it credible only to a degree is because it wasn't audible on the tape, and there was no evidence that Trooper Volk heard these statements if they were made. In reviewing the audio videotape in preparation for this oral argument, I'd like to direct the courts to a citation that may not be apparent from our briefing, and that is at 21-57-30 through 21-58-30. The tape clearly shows Trooper Volk leaving the back of Mr. Williams' car where he had been screwing in some speakers, leaving the view of the camera, saying, yes, sir. And Mr. Williams can clearly be heard over all the traffic points and background saying, I've been out here. I've been standing out here 45 minutes. There's a lot more to say. But I can give you people the right to search my car and everything, and I've been standing out here. And there's a lot of traffic noise. So not everything is heard, but you can tell that he is clearly protesting. His voice is loud. But very important, in the middle of this, Trooper Volk turns around and walks away from Mr. Williams while he is still protesting. Mr. Williams can be heard for 30 seconds after Volk has continued. He's back at the car. He's again tearing it apart, looking through it. Mr. Williams is still in the background over the traffic noise, talking, complaining. He's exasperated, clearly, at this point. Yes, it had been an hour and 20 minutes since he had been pulled over, and over an hour or nearly an hour since the search began. He's frustrated. He's exasperated. But where do we get the revocation of consent? And maybe do we have a clear standard for revocation of consent? Does it have to be unequivocal? Could it be ambiguous? What's the standard? Well, the standard, as articulated by those circuits, and this circuit alluded to in the unpublished decision from 2003 about Wilmore, was that there must be an unequivocal or unambiguous statement or action that is inconsistent or evidences the desire not to be searched, or in this case, of course, his search. Unambiguous must mean it has to have meaning. It must mean that it's only capable of one interpretation. And why is his exasperation, frustration, and the comments that you just mentioned, why is that? If you look at the totality of the circumstances and applying the Supreme Court's standard with regard to voluntariness, which is considering the totality of circumstances, what would a typical person have understood by the exchange between the officer and the suspect? Mr. Volk, or Mr. Williams, excuse me, had been there. Mr. Williams had been questioned by Trooper Brody, given a very aggressive stance. I assert threatened with potentially a body cavity search. He had been three times, or at least twice, saw Trooper Volk looking under the undercarriage, in the trunk, in and out of the car, back to his cruisers, you know, sitting in the cruiser for some period of time, getting out, going back to the car again. This search had gone on for a long period of time. In the meantime, Mr. Williams had requested his cell phones. He was not given his cell phones. Perhaps he was going to call his lawyer and say, how do I get out of here? Instead, Trooper Brodington looks through his cell phones. In violation of the Fourth Amendment, reads his text messages, confronts Mr. Williams about what was on his text messages, knocks on the window of Trooper Volk's cruiser while he's sitting in the cruiser. And again, you can hear the exasperation. Even in Trooper Volk's language, sighing, I just can't find it. I just can't find him. I'm getting too old for this. And yet, it's certainly a shot in the arm when he hears the text message. He gets up and, again, he goes back to that vehicle and continues with his search. Yeah, the district judge, though, held it under the independent source doctrine, right, that that didn't affect the continuation of the search? The district court held that Trooper Volk would have continued his search regardless. Right. And that was – I submit that. And that's a debatable point, I think. I believe it certainly is. But can we do anything with it? Is that the typical, you know, judgment call that district judges make? I think this court has to look at the evidence presented, which certainly includes the audio and video. But hadn't Trooper Volk already at that point called for the drug dog to come sniff? He did, Your Honor. And I would like to address that because I think this court cannot affirm on the basis that a drug dog would have at some point in the future arrived and alerted to the drugs. And the reason for that, there are several reasons. One is, first of all, it's pure speculation. We don't know that this particular drug dog would have alerted. And had the drug dog showed – had they respected his withdrawal of consent and said, okay, we no longer have consent, we're going to close up the car, we're going to wait for the drug dog, if the drug dog arrived and alerted, which is not a certain thing. We don't know what the training experience, whether false positives for this dog, whether it had been certified. The record is completely without that information. But had the drug dog arrived and alerted, that does not give the police officers permission, and probable cause to immediately start searching the car on the side of the street. Ms. Prentz, what about your coercive environment argument that you make in your brief? I mean, you've alluded to that this morning, but you really haven't touched on that. Again, I think that – Could you explain that a little more? Under the totality of the circumstances, which is a test for voluntariness. Right. This clearly began as a voluntary consensual encounter between Mr. Williams and the officer. He consented to the search. As time went on, however, the audio shows and the video shows frustration on behalf of our client, Mr. Williams. Okay. There are noises. Mr. Williams testified that when Trooper Brodingham arrived, he was, in Mr. Williams' words, assaulted. But there certainly was evidence to show that there was some disagreement between Trooper Brodingham and Mr. Williams. There are loud voices. There are some shuffling sounds. Perhaps it wasn't assault, but this was not the calm, relaxed encounter that the district court's findings of fact found it to be. Even the other trooper on the scene walks to Volcom Brodingham and says, he's getting antsy. Well, what else can getting antsy mean? Except that Mr. Williams was becoming frustrated. Oh, that's pretty ambiguous, right? Antsy could also mean he's getting nervous that we're about to find something. I think in the client, well. Isn't that a possible interpretation of antsy? I think it's possible, but I don't think it's supported by the evidence in this case. And that is because we could hear Mr. Williams in the background several times asserting himself. Unfortunately, there's so much road noise, it's not clear. We don't know exactly what he's saying. But what is clear is that there were, this was not a calm encounter throughout the entire interaction. As time went on. It got worse as time went on. There's no doubt about that. It absolutely got worse. And I, when you're on this, I would submit that a reasonable person on the side of the road who is asked if something, excuse my language, if you have anything hidden up your ass, in a very aggressive fashion, several times, that's a very intimidating experience. You didn't raise the Supreme Court decision in U.S. v. Rodriguez from last term. No, I did not, Your Honor, because. And why? Doesn't that have some applicability to go into this search here? Well, Rodriguez held that any delay without reasonable suspicion for the calling of a drug dog is violative of the Fourth Amendment. Okay. And I think that may have come into play had they respected his choice to refuse consent and waited for a drug dog. Then the question might be before this Court, what is the outer limit of a Terry stop? But that's not the circumstance. The police chose a course of action here. They wanted consent. They asked for it. And then they refused to accept his withdrawal or any sort of limitation upon consent. It's very similar, I think. Why wouldn't a Rodriguez theory support your position there? Well, it may. And if there's not reasonable suspicion to hold him, then certainly any delay beyond the revocation. I assume you didn't raise it because this is a consent search. If this were not a consent search, then Rodriguez is really helpful to you. Precisely. It might maybe dispositive. Precisely. But what you need to show is that he revoked consent. Or that he was prevented from revoking his consent. Or preventing. I'm not trying to argue your case for you, but I'm trying to suggest that your argument here about the coercive environment and his frustrations slash attempt to revoke consent  about the reasonableness of a lengthy delay without reasonable suspicion or probable cause to think that a violation of the law has occurred. Well, I certainly agree with that, Your Honor. Mr. Williams, particularly I think as the search went on and nothing was found, this stop was based upon a hunch that he had met with a drug dealer. There was no surveillance in Detroit. There was no confidential informant, no tip. It was a hunch. And I believe that Rodriguez may change the landscape of what is reasonable under Terry in terms of how long a citizen can be held on the side of the road awaiting for the arrival of a drug dog. But that question isn't before us. It might have been, as I said, had they chosen to respect his desire to no longer be searched. Could you address the RICO issue, Ms. Brunson? Absolutely, Your Honor. And I think that the RICO issue is actually a very simple analysis. There's no question the categorical approach applies in this case. The question is what is the statute of conviction? Not the modified categorical? The modified categorical approach applies whenever a statute is divisible. And assuming that it is divisible, and even if it's arguably divisible to its, you know, most favorable form for the government, we must look to the definition of a predicate act in 1961-1-SB. And that would be, even if you break it down into, you know, assuming it's divisible, and I'm not conceding that it is, to the clause which reads, the felonious manufacturer, importation, receiving, concealment, buying, selling, or otherwise stealing uncontrolled substance, et cetera, punishable under any law of the United States. That definition, that element, that predicate act, is broader than the definition of a controlled substance offense as defined by the guidelines. Right. And categorically, it cannot be a controlled substance offense. Right. But then, correct. And then the question becomes, though, we have the guilty plea colloquy, which is a valid Shepard document, and why did. . . The specific offenses. Right. He admits the specific conduct in that guilty plea colloquy, so why did the district court err in accepting as true what he said under oath in the guilty plea colloquy? Because it was conduct, Your Honor. It is a manner, it is a means in which the government was going to prove the element of a pattern of bracketing activity. The Supreme Court has said over and over again when discussing the categorical approach that the facts do not matter. No, well, now we're in the modified categorical. But the modified categorical approach. . . I know you don't agree with that, but I'm asking you to accept that for a minute. Because there are different ways of violating this RICO law that you just articulated, manufacture, importation, et cetera. Some of those ways are not, for example, the concealment. That's not good enough for a predicate offense. I don't think receiving is good enough for a predicate offense, is it? That is correct. So then if in his guilty plea colloquy he had explained that he had received drugs or had concealed drugs, then he wouldn't have a predicate crime. But the guilty plea colloquy, if I remember correctly, said that he was selling drugs, right? Yes. So why did the district court err in accepting as true what he said in that colloquy? And in order to ascertain which type of violation under subsection D he was guilty of. That would require, Your Honor, first a finding that the Predicate Act definition of 19611 is divisible not just to this phrase, but to each individual means. In other words, that the receiving and the concealment, the selling are all different violations of RICO. If that is the case, RICO is divisible into thousands of different crimes. Isn't that sort of the way RICO is structured? I mean, you've got this, obviously it's a unique statute and it's complicated, but you've got this overhang of racketeering activity, pattern of racketeering activity, right? And then Congress has seen fit to make all kinds of other actions criminal under that umbrella of pattern of racketeering activity. And there are specific racketeering acts that he has found that he has pleaded guilty to? Well, there's specific conduct that is admitted to which would fulfill. Indeed, if you look at the plea colloquy, the government is asked, the prosecuting and assisting United States attorney is asked to identify the elements of the crime. And he does that. And he never mentions the Predicate Act, simply that there's a pattern of racketeering activity. Then when the government is asked to relay the evidence, which would support, which it would put on at a trial to support that crime, that is when the discussion of the 21 U.S.C. 841 activity comes into play. So under math is the government never identified this as an element of the offense? Because it's not an element of the offense. But then why would it be charged to the jury? Then we get into that problem. Because it is. The jury would have to find this beyond a reasonable doubt. Because of the structure of RICO, that is true. But there's, again, we're moving away, though, from the language of the statute of conviction. And that is, I think, the most important pertinent part of this analysis is what counts is the statute of conviction. The statute of conviction is not an underlying controlled substance offense. In fact, he was charged with a substance offense. But the whole point of the modified approach and the categorical approach and the modified categorical approach is to be able to tell exactly what prior acts this person has committed. And when you have a plea colloquy where there is testimony about the prior acts, that is, to me, seems clearly established on the record. The same situation where you on. If I may respond to that, I disagree. I do not believe the purpose of the modified categorical approach is to find out what prior acts were committed. The purpose of the modified categorical approach is simply to allow the court to determine what statute the defendant was convicted of. And that brings us back again to what is the statute of conviction. The statute of conviction is not a controlled substance offense. Without regard to whether or not that controlled substance offense would have fulfilled the requirements of the government's burden to prove a pattern of racketeering activity is irrelevant in terms of determining whether or not it constitutes a controlled substance offense. The statute of conviction is RICO. Now, back in, you know, with this federal RICO prosecution, the government could have insisted on going to trial or obtaining a plea to a substantive controlled substance offense. They did not. There must have been some benefit that was received for, you know, receiving the or ascertaining a federal RICO conviction instead. But they must live with that now. It is simply not a controlled substance offense. You need to look to the definition of controlled substance offense under the guidelines and the statute of conviction. The statute of conviction is overly broad. All right. If we do that, though, then that means RICO can never count as a predicate conviction for purposes of career offender. I believe that is true. Okay. All right. Thank you, Ms. Brunson. Ms. Kokas. Would you mind starting with the issue we were just discussing with Ms. Brunson? Sure. The RICO issue? Yes. Yeah. Good morning. May it please the Court. Don McKokas on behalf of the United States. Our position is as set forth in my brief, as methodically and painfully really as I could have, which is, and here's how I got to this. When I started thinking about RICO conspiracy, a conspiracy charge itself is kind of a cipher. You don't know what it is a person has conspired to do illegally until you hear conspiracy to do what. And so that's why you have to drill down from 1962 to the definitions of 1961. And then when you see the conjuries of racketeering acts that are possible, you have to drill down using the modified categorical approach because it's the only way to get there, to see what the actual charged predicates were in this case. But it's so unique, right, because 4B1.1 allows us to look for the crimes of conviction and he was not convicted of the underlying drug crimes. But he's convicted of the RICO conspiracy and an element of that is the racketeering act, which is the underlying crime. All right. So that's what the modified... So it's all about elements versus means then, right? That's another case under Mathis. Right. According to the Supreme Court it is. And if you look at, I would go back before Mathis to Descamps because in Descamps the Court says you use the modified categorical approach when the government has to charge something as an element, has to prove it, charge it, and when a jury has to find it unanimously beyond a reasonable doubt. That's right out of Mathis and that's exactly what we have with the RICO statute. Jury has to find these racketeering acts unanimously beyond a reasonable doubt. It's why he had to plead to them. All right. But the jury didn't have to find, did it, that he was actually dealing or buying or selling, right? Wouldn't the jury have been instructed with the entire laundry list that Ms. Brunson mentioned and then only have to find one of those? And in theory the jury could have found receiving or concealment. No, it would have been instructed with the 841. See, that's why I use kind of the Matryoshka doll example because you begin with the outer babushka, which is the RICO offense, and you go down through the definitions. And when you get to 841, that's the point where that's going to form the sort of, I call them, I guess, sub-elements now of the element of the racketeering act. All right. And what would that instruction have looked like? Well, it would have looked like an 841 instruction. Which is? Well, off the top of my head, I don't know, but it tracks the language of the statute and that's why I took the pains to show that the 841 statute is no broader than and is in fact narrower than the generic offense as defined by the guidelines. And it would be the same instruction given if this were for a trial on an 841 offense as opposed to a racketeering offense? Well, it should. It would have both. It would have the racketeering part and the conspiracy part. As for the 841 offense, it would have the same instruction that the jury would get if that was the only offense they could see. Correct. But that's why, I mean, to me, really the most important case is the one, like all good advocates, I buried in a footnote. It's this court's Robinson case from last fall because. That's what I was sort of trying to get around. Yeah. Well, and the way the court framed the issue was, is a Hobbs Act robbery committed while brandishing a firearm a crime of violence? Here, it's similar. Is a RICO conspiracy committed while violating 841 a controlled substance offense under the guidelines? All right. If we didn't have the guilty plea colloquy, you have a problem, right? Because there would be a chance that he was guilty of receiving or concealment, which are not predicate offenses. No, Your Honor, because you still don't. First of all, I'm glad we do have the guilty plea colloquy. Don't get me wrong. And we for sure would have a problem if you don't apply the modified categorical approach. We lose then. But even with just the – because keep in mind, I put the indictment into the record as well, and the indictment shows that he has pleaded. The racketeering element tracks back to the racketeering acts 3841s and 2846s, which incorporate 841s. So at no point – I understand that the defense is trying to make it sound like, well, the definition's in 861 or too broad, but that's not what you're comparing. You drill all the way down to this inner babushka of 841, and then whatever that universe of possible acts is, you compare that to – And because 841 maps onto all predicate offenses, he doesn't have an escape hatch. Correct. That's why. And that's independent of the guilty plea colloquy. It is. It is. It's as charged in the indictment. But it does – the guilty plea colloquy helps us because it does confirm that he did have to admit this. It just seems so troubling there's no case law on this, right? Ms. Brunson makes the candid argument, hey, you know, RICO says what RICO says. It's an overhang, and none of these RICO offenses are going to qualify as predicate offenses. There's no case law on that? There isn't very much. I mean, you guys would be the first. That's why I took such pains to try to map out step by step the analysis here. To my knowledge, there wasn't much case law about this in the Hobbs Act context either. So I don't know that it's – we shouldn't necessarily be afraid of that. Yeah, we're at the edge of a brave new world here. You're the first person to say it. I mean, someone's got to be first. Yeah, but what's novel about this situation? It seems like an entirely not novel situation. And candidly, I don't know. When I was as floored as anyone when I'm reading this and going, why am I not finding cases? I mean, I began to doubt my research abilities. But the more I did this, the more I confirmed it really wasn't much. There's a Ninth Circuit one from 2013 called Murillo-Prado, but it interprets an analog RICO statute from Arizona State. And it follows this same – I don't know if it follows the analysis, the depth I did, but it gets to the same place. So that's why it's our position that if you apply discounts, and I don't think anything's said in math that's overruled discounts. I mean, I think Justice Kagan would be the most surprised of anybody since she wrote both. But you follow it, you apply discounts, you apply Robinson, you apply the analysis as I've set forth to the extent you don't think it's flawed in any way, you should get a clean answer here. If I could, I'd like to return to the whole consent issue. You know, he's made two not just inconsistent but irreconcilable arguments about this. He says he either revoked consent or he was too afraid to revoke consent. In point of fact, neither of those – Well, either one works. They're both winning arguments. Yeah, but they're irreconcilable. And they can make arguments in the alternative. Yeah, but this is more than just an alternative. I mean, you can't believe both of these to be true. And in point of fact, neither of them is because we have one comment that you can hear on this tape where he says, I've been out here half an hour, man, about 51 minutes into the search. Then he also testifies, and the court credits him to this extent, that he has said at various times, twice I think he said, you know, you're holding me up and I got to go. Once again, I don't have Third Circuit authority about this, but I found ample authority from the Eighth Circuit of all places that interpret this, that say this could be construed as impatience. Now, keep in mind, Your Honor's standards is that you have to decide whether the district court clearly erred in finding that a reasonable officer in Trooper Volk's position could construe these statements, assuming that he heard them, as ambiguous. It's my position that if you hear those comments, such as I got to go, you're holding me up, those actually could just mean hurry up. I mean, they're actually more likely to mean hurry up and finish what you're doing rather than stop what you're doing entirely. And we know that this man was not too afraid to tell them to stop, because as a point of fact, he said after Trooper Browdingham asked him, is it up your ass, he then said when he saw them messing with his speakers, he said, you need a warrant to search my speakers, or my speaker. And then he said when he saw Trooper... Did they then stop searching the speakers? I couldn't quite tell. Yeah, he stopped. So what happens, Your Honor, is it's a little hard to figure out exactly how this fits in with his testimony, but what seems to happen is he gets upset when Trooper Volk is unscrewing what looks like a subwoofer or something in the speaker, and then when he says that, Volk stops and just starts kind of looking around the back of the speaker. And then after this, I think at 2153, around there, when... No, this would be 2148, is when Browdingham comes over to him with his cell phones, and he claims that's when I told him, you need a warrant to go through my cell phones. He didn't at the time, but he did tell him that. So it's clear that Mr. Williams knew how to revoke consent to search the whole car. Or he could have simply said at any point, you need a warrant to go through my car now. Or he could have said, stop. He could have said, can I leave now? Those would have triggered, I think, some obligation on the part of the officers. But a finding of impatience, I think, would be clearly erroneous, right? I mean, a finding of impatience would be clearly erroneous, I suggest. I mean, I used the word exasperation earlier. I mean, the longitudinal picture of this shows a situation that continues to deteriorate over time for all parties concerned, perhaps because of the weather. But I guess your answer to that is that's not the state. Exasperation is not enough. You're falling back on the position that consent needs to be unambiguous. Right. And on that point, I agree with Mr. Williams' counsel. I mean, she said it has to be capable of interpreting it only one way. So as long as it is not clear error to interpret that statement as being something other than I want to stop, which is how the district court interpreted it, then I don't think he has a leg to stand on. And that's a factual finding? And that's a factual finding. But let's suppose here that this search was lengthy and it was rather extensive. Let's suppose here that the officer said, you know, they found this heroin in this, quote, parking brake cover. I'm not sure my automotive knowledge and skills aren't sufficient to tell me what a parking brake cover is. But suppose the state policeman says, I don't have the right tools here. I'm going to have to take this car into the garage to be able to disassemble a couple of these manufactured parts to determine whether or not something might be hidden in one of them. And he looks around and he goes, what? You know, I can't believe this. I've been here 50 minutes. You're going to take it in to further disassemble the car? I mean, you know, what does a person do at that point? I mean, it's like how much time can a search go on before a consentor wonders, you know, exactly, geez, you know, what did I do? I've sort of told them I don't want to wait any more. I mean, what magic words have to be said? Well, how about you need a warrant now to go through? It's the same with the speech. Doesn't he say that, though, when he gets to the cell phone, which was before getting to the parking brake cover? Right. He said both of those things. I mean, why isn't that sufficient? Why isn't that sufficient to constitute revocation? When he says you need a warrant to go through my cell phone? Yeah. Well, the district court found that it was. Okay. But why isn't that also sufficient to say once he said you need a warrant that that was a revocation of consent to any further search? Well, because he said you need a warrant. He claims to have said you need a warrant to look at my speaker. You need a warrant to search my cell phone. So he says twice you need a warrant here. And they keep on going. But he didn't say you need a warrant. If he just said you need a warrant, that might have been something. But he claims to have said, and the court credited him in his testimony for saying you need a warrant to look at my speakers. You need a warrant to look at my cell phone. And since people can revoke searches on a piecemeal fashion, that's what he seems to have been doing. Yeah, but it seems to me that the whole concept of reasonableness has to be applied to the circumstances here. And to then go beyond what he's just said and get to a parking brake cover, which, I don't know, where is it? Where is the parking brake cover? Do you know it? We don't have one on all your vehicles. Yeah, it would be if you drive a stick especially down kind of in the center console, you could pull it up. Is that where it was? It was inside? It was somewhere, yeah. It was inside the parking brake cover inside the car, yes. Inside? Yes. In other words, if it's a handbrake, as if I'm thinking of a pedal brake. Yeah, no, no, no. Handbrake. It's on the handbrake. Yeah, yeah. Okay. Yeah. But, I mean, my point is it seems that if you look at this in a reasonableness standard, you might have passed that. But looking from the coercion, this is a very important point because on this point of coercion, the defense is arguing this is a reasonableness standard. Under Bustamante v. Schneckloth, under United States v. Jacobs, it's Third Circuit 2005. It's a Judge Ambrose decision. It's not a reasonableness standard. You ask whether his will subjectively was overborne, subjectively. So it's not would a reasonable person have construed Detective Brattigan's comments as a threat or even a reasonable person standing out there that long. It's what do we know about this defendant. So do you look, then, if it's subjective, do you look at the level of coercion that existed at the scene? Yeah. And so you have one comment from Trooper Brattigan, is it up your ass. Trooper Brattigan is plainclothes, no weapon visible anyway. He poses it in a question. He poses it in a normal tone of voice. No search of that kind is done. And then after he poses the question, you have Williams revoking in a piecemeal fashion consent to search stuff inside the car, the speaker, the cell phones. Why didn't he revoke the consent to search the car? I think it's because from the very outset of the encounter, he boxed himself in with his own lie to Trooper Volk. Because remember, when Volk stops him, he says, well, the reason I'm speeding is I'm about to run out of gas and I'm trying to make it to a gas station. And then when Volk gives him that little speech about combustion engines, now he doesn't really have a place to be. It's not like he can say I'm late for some important engagement, now you need to let me go. He just has general concerns about being there that long. And once he gives consent, we're off the clock. I understand under Rodriguez the time may be a factor. Yeah, I'm not saying, you know, I think Spring Court was trying to say something in Rodriguez. Right. They were trying to say something more than just it's up to the speed of the state policeman in writing up a ticket. Right. And I don't think we can ignore what they said. No, and it may be a factor. It may be a factor at that point. But, I mean, I think when you combine the ambiguity of his comments plus who Mr. Williams is, I mean, we know he has extensive criminal background. And you combine it with the fact that he feels comfortable enough revoking consent piecemeal about various other items, he's still asking even after this incident for things like I want my coffee, I want my cigarettes. I mean, he's getting stuff from the car. It's just, it's hard to say that a reasonable officer would have concluded that that meant that he was officially revoking his consent to search the entire car. I see I'm out of time. I don't know if I can have just a minute to discuss the inevitable discovery. I think we can handle that on the briefs. Okay. Thank you, Mr. Coates. Thank you. Rebuttal, Ms. Brunson. Yes, Your Honors. First I'd like to address quickly the government's position that Robinson has any applicability here. Robinson was a case in which this court decided that the categorical approach has no application because the crimes of conviction, the Hobbs Act robberies, as well as 924C, were tried by the same jury before the court, and so there was no need to apply the categorical approach. There's no dispute here. The categorical approach does apply. Oh, there is a dispute. Well, the government agreed in its briefing that the categorical approach applies when you're determining. Perhaps the modified categorical approach is what you're getting at there, Your Honor. Yeah, they're very different. I don't think they are. The modified categorical approach really just allows you to see what statute the defendant pled to or was convicted of. And what's your response to the 841 argument? Was the 841 crime charged in the indictment? It was, Your Honor. As a separate substance of crime. And the jury specifically had to find him guilty of that racketeering act, which was the 841 offense? Well, the jury would have had to have found that a racketeering act consisting of that offense occurred and that he was employed by the enterprise or otherwise involved by the enterprise. Hence, the indirect conduct argument that, you know, the controlled substance offense definition in the guidelines requires that the, you know, that the conviction be for the certain activities involving controlled substances. And then the specific controlled substance offense were set out for the jury to consider each one of those offenses, which had all the elements of a conviction for that controlled substance offense. Again, though, just to fulfill the government's burden of proving a predicate act. Yes. A predicate act. That predicate act was a controlled substance offense, as is defined by the sentencing guidelines. Yes, I would agree that had he been convicted of that controlled substance offense, which was listed as a predicate act, that would have qualified as a controlled substance offense. Right. But it wasn't. It was just part of proving the overall crime. And the relevance of the Robinson case is what I was saying before, that the whole purpose when we're looking at past convictions, we want to know exactly what it was. We don't want to speculate as to what that past conviction was for. And here, as to a controlled substance offense, we can see in the racketeering acts exactly what offense was charged and found by the jury to have been committed. I would just direct you to the Supreme Court's, as far back as Taylor said, that when applying the categorical approach or modified categorical approach, since it leads you to what section of the statute the defendant has been convicted of, a crime should never sometimes count and sometimes not count. The crime here is RICO. It is not 21 U.S.C. 841. That pertains. Right, but that seems to get back to what Mr. Kokas admitted, which is if we apply the categorical approach here, the government loses. And it sounds like what you're saying, you're urging us to just look at RICO and stop. And if we apply the categorical approach to RICO, then we don't drill down to the guilty plea colloquy and the 841 and all that. That is correct. So that issue really turns on the defendant. RICO is divisible, such that the modified categorical approach would have application. Right, okay. Okay. And if I could, I know I'm over time, if I could briefly address the other issue. Yeah, sure, go ahead. Which, of course, would be, I want to say, first of all, we're getting into the subjective beliefs of Mr. Williams. And the government points out he had extensive experience with the criminal justice system. We don't know what that experience has been. And we're talking about a man. Well, we do know that he knew how to revoke consent, at least with respect to some aspects of the search, right, the cell phone. Or attempt to, at least. He attempted to revoke his consent. Again, I submit that the court needs to look at this overall, the period of time, the increase in aggressive conduct toward Mr. Williams, the time in which he was held, the weather, the fact that there are three officers there, more arrival on the scene, he's questioned about things. Oh, remember, you can hear him throughout this tape protesting. He says, yeah, I've been out here a half an hour, man. Five, ten minutes later, he says, I've been out here for 45 minutes. You know, he's frustrated. He doesn't even know how much time he's been out there. He's been out there for a long time. You can hear him complaining. You can hear loud voices. You can hear Brian's voice in the background quite consistently after he arrives, having conversations with Mr. Williams. What we don't know is what was said. Trevor Brottingham didn't testify. But Mr. Williams is not contending that in those unheard conversations that he said, all right, stop. No more search. Let me out of here. He did. He testified that he said, you searched my car three times. You held me on the side of the road. I need to go. Yeah, but he didn't say stop the search. I need to go. And he doesn't contend that he said stop the search. Perhaps. But, again, the case law is very clear. No magic words need to be uttered. And I think any rule that is set forth by this court needs to be one that's reasonable, that could be reasonably expected of a citizen. And to require them to say the magic words, I revoke my consent, is not a reasonable test. And, again, consensual searches are acceptable under the Fourth Amendment because they're reasonable because the person has consented. When the person chooses no longer to consent, that should be respected by the police in whatever manner, as long as it's a reasonable revocation and apparent from the circumstances, that should be respected by the police officers. And that was not done here. And I think that is most certainly evidenced by the video and audio tape. And I think, one last thing, in applying the clearly erroneous standard, this court can reverse if it's left with a firm and definite conviction that a mistake has been made. And that, I submit, happened in this case. We've asked the court to reverse the denial of the motion to suppress. And if it should not do that, then any alternative to vacate his conviction or remand for resentencing. Thank you, Ms. Brunson. Before we adjourn, I just want to acknowledge the presence of students we have. I think we have some law students. I think we have some middle school students. Our court tries to be active in the community, even though we appellate judges lead rather monastic existences. And we're very happy to see so many of you here. I think my existence is not in a monastery. I think it's a nunnery. Yes. And we're happy to see so many of you here, particularly on a day when we had such fabulous advocacy. And the court's grateful to counsel for the excellent arguments. And we'll take this last matter under advisement.